# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT LEXINGTON

**CIVIL ACTION NO.:** _____

**UNITED STATES OF AMERICA,**                                    **PLAINTIFF,**

**v.**

**JEROME HAHN, and**
**TELEHEALTH HOLDINGS, LLC,**                        **DEFENDANTS.**

---

### COMPLAINT

---

Plaintiff, the United States of America, by and through its undersigned counsel, for its complaint against defendants herein states as follows:

### INTRODUCTION

1.      The United States of America ("United States") brings this action against Jerome Hahn ("Hahn") and Telehealth Holdings, LLC ("Telehealth") (together, "Defendants") to recover treble damages and civil penalties for their violations of the False Claims Act, 31 U.S.C. § 3729, and to recover damages and other monetary relief under the common law or equitable theories of payment by mistake and unjust enrichment.

2.      From 2010 to 2013 (the "relevant period"), Defendants engaged in a pattern of fraudulent conduct to improperly obtain over $600,000 in federal grants from the United States. Defendants knowingly made false statements and false certifications in grant applications in order to win the grants. After the grants were awarded, Defendants misused the grant funds, including by

1

expending federal grant money on personal expenses and on business costs not allowed under the grant regulations.  Defendants then attempted to conceal from the United States that the funds had been misspent by falsifying invoices and accounting entries.

3.      In February 2016, Hahn pled guilty to conspiring to defraud the United States in connection with two false claims submitted by Telehealth to the National Institutes of Health ("NIH"), a component of the U.S. Department of Health and Human Services ("HHS").  This complaint seeks to hold Hahn and Telehealth liable under the False Claims Act for these false claims and others.

## JURISDICTION AND VENUE

4.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33, and under common law and equity.  This Court has subject matter jurisdiction pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345 because the United States, as plaintiff, brings this civil action under the False Claims Act. This Court has supplemental jurisdiction over the common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

5.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants submitted, or caused to be submitted, false claims to the United States in and from this District.

6.      Venue is proper in the Eastern District of Kentucky pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because Hahn resides in this District, Telehealth transacts business in this District, and acts proscribed by the False Claims Act occurred in this District.

## PARTIES

7.      Plaintiff, the United States of America, brings this action on its own behalf and on behalf of HHS and its component agency, NIH.

8.      Defendant Jerome Hahn is an individual who resides in Lexington, Kentucky (Fayette County).  Hahn is the owner, Chief Executive Officer, and President of Telehealth.  At all relevant times, the actions of Telehealth occurred at Hahn's direction and with his approval and consent.

9.      Defendant Telehealth Holdings, LLC is a limited liability company organized in Nevada that claims to be in the business of developing various medical devices.  Telehealth, through its agents, including Hahn, submitted applications to the agencies of the United States to obtain federal grants to fund the development of these devices, including a sleep apnea monitoring system and an electronic pillbox.

10.      Hahn worked as a lead under numerous federal grants, a fact that Telehealth emphasized in its grant applications to NIH.  For example, Telehealth highlighted that Hahn served as Co-Investigator for eleven Small Business Innovation Research ("SBIR") grants awarded by NIH during the period 2000 to 2009.  During the relevant period, Hahn was listed as the Principal Investigator for at least three SBIR grants awarded by NIH, two of which are at issue here.

11.      Telehealth employed as its Project Manager Vesta Brue ("Brue"), Hahn's professional and personal partner.  At all relevant times, Brue acted as Telehealth's authorized agent, and acted with the approval and consent of Hahn.

12.      Like Hahn, Brue has substantial experience with federal grants. According to Brue, she is the author of approximately 50 federal grant

applications, 18 of which were awarded.  She served as Principal Investigator for at least five SBIR grants awarded by NIH to companies she owned.  As with Hahn, Telehealth boasted of Brue's federal grant experience in its grant applications to NIH.

13.     Hahn knowingly made an agreement with Brue to defraud the United States by getting false or fraudulent claims paid in connection with federal grants awarded to Telehealth.

## THE FALSE CLAIMS ACT

14.     The False Claims Act prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A).  It also prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  *Id.* at § 3729(a)(1)(B).

15.     The False Claims Act prohibits knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay money to the United States.  *Id.* at § 3729(a)(1)(G).  It also prohibits concealing, or knowingly and improperly avoiding or decreasing, an obligation to pay money to the United States. *Id.*

16.     The False Claims Act prohibits conspiring to get a false or fraudulent claim paid by the United States.  *See* 31 U.S.C. § 3729(a)(1)(C).  A civil conspiracy to violate the False Claims Act does not require an express agreement

among all conspirators, nor does each conspirator have to know all the details of the illegal plan.[1]

17.     The term "knowingly" under the False Claims Act means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b).  No proof of specific intent to defraud is required to show that a person acted knowingly under the False Claims Act.  *Id.*

18.     Violations of the False Claims Act subject a defendant to civil penalties of not less than $5,000 and not more than $10,000 per false claim, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions.  31 U.S.C. § 3729(a).

## DEFENDANTS' GRANT FRAUD

19.     Telehealth received federal grants from the United States through two programs:  (1) the SBIR program; and (2) the Qualifying Therapeutic Discovery Project program.  Defendants violated the False Claims Act in connection with both grant programs by knowingly making false statements and false certifications in the grant applications.  Defendants also violated the False Claims Act in connection with the SBIR grants by falsely certifying that grant funds had been expended for the purposes of and in compliance with the terms of the grants.  In fact, the grant funds had been spent on expenses not permitted

---

[1] *See United States ex rel. Gene Burton v. UT Med. Grp., Inc.*, Civ. No. 03-2740 (W.D. Tenn. Jan. 27, 2010) (slip op.) (citing *United States v. Murphy*, 937 F.2d 1032,1039 (6th Cir. 1991)).

under grant rules or unrelated to the grant-funded projects, such as personal expenses.

### A.  Defendants' Fraud In Connection With SBIR Grants

### (i)    The Small Business Innovation Research Program

20.    The United States, through NIH, awarded Defendants two of the federal grants at issue under the SBIR program.  Congress established the SBIR program in 1982 to support scientific excellence and technological innovation, increase employment, and build a strong national economy through the investment of federal research funds.  *See* Small Business Innovation Development Act of 1982, Pub. L. No. 97-219, 96 Stat. 217 (1982).[2]

21.    SBIR grants are made on a competitive basis.  A small business must submit a grant application to a participating federal agency, and the agency evaluates the application based on a number of factors, including its technical merit and the qualifications of key personnel and consultants, among others. The agency relies on the truth and accuracy of the information contained in the application in making award decisions.

22.    NIH participates in the SBIR program.   NIH reviews grant applications, issues the awards, and provides program and financial management and oversight for SBIR grants.

---

[2] Congress reauthorized the Small Business Innovation Development Act until September 30, 2000 by the Small Business Research and Development Enhancement Act of 1992, Pub. L. No. 102-564, 106 Stat. 4249 (1992), and reauthorized it again until September 30, 2008 by the Small Business Reauthorization Act of 2000, Pub. L. No. 106-554, 114 Stat. 2763 (2000). Subsequently, Congress passed numerous extensions, the most recent of which extends the SBIR program through 2017.

**(ii)**    **SBIR Grantees' Compliance Obligations**

**(a) SBIR Grantees' Certifications To NIH**

23.    To receive an SBIR grant from NIH, a small business must first submit a grant application. During the relevant period, and in accordance with statutory, regulatory, and related guidance published and confirmed annually, SBIR applicants were required to use a standard application form called SF 424 (the "NIH Standard Application Form") (*See, e.g.*, Sleep Apnea Grant Application, attached hereto as Exhibit 1.)

24.    The NIH Standard Application Form called for detailed information about the applicant and the proposed project, including: (i) a research plan; (ii) a description of the project site location(s); (iii) profiles of senior and key personnel (including the project's Principal Investigator(s) and any consultants); and (iv) a detailed budget. With the NIH Standard Application Form, applicants could also include letters of support for the project, the small business, and the Principal Investigator.

25.    The NIH Standard Application Form also required the Authorized Organizational Representative ("AOR") for the applicant small business to provide certain assurances and certifications through his signature. As discussed below, Hahn was the AOR for the SBIR grants at issue here.

26.    By signing the NIH Standard Application Form, the AOR certified on behalf of the small business that the statements in the application were true, complete, and accurate. (*See, e.g.*, Ex. 1: Sleep Apnea Grant Application at 2, Box 17.)

27.    By signing the NIH Standard Application Form, the AOR acknowledged on behalf of the small business that "any false, fictitious, or

fraudulent statements or claims may subject [him] to criminal, civil, or administrative penalties."  (*Id.*)

28.      By signing the NIH Standard Application Form, the AOR certified on behalf of the small business that, if awarded a grant, it would abide by the terms and conditions of the award.  (*See id.*)

29.      All recipients of SBIR grant awards ("grantees") are also required to submit to NIH financial reports accounting for their expenditures of grant funds.  *See* 45 C.F.R. § 74.52.  In each report, the grantee certifies that the report is true and accurate, and that the expenditures were made for the purpose and in compliance with the terms and conditions of the grant.

### (b) Terms And Conditions Of SBIR Grants

30.      The NIH Grants Policy Statement, the Uniform Administrative Requirements For Awards, 45 C.F.R. § 74 *et seq.*, and the cost principles for commercial organizations set forth in the Federal Acquisition Regulations, 48 C.F.R. subpart 31.2, all serve as terms and conditions of NIH SBIR grant awards.

31.      Grantees are repeatedly notified that these sources govern the use of NIH grant funds.  For example, each NIH Solicitation of Application and corresponding Application Guide notifies applicants that they will be bound by these rules and regulations.

32.      Moreover, each grantee receives a Notice of Grant Award from NIH.  During the relevant period, the Notice of Grant Award highlighted the rules and regulations that govern NIH SBIR grants, including by citing the Uniform Administrative Requirements For Awards, 45 C.F.R. § 74 *et seq.*, and the NIH Grants Policy Statement.

33.     During the relevant period, NIH also provided a "Welcome Wagon" letter to grantees.  This letter notified grantees that "[a]cceptance of an award from NIH carries with it the responsibility to be aware of and comply with the terms and conditions of award."  The letter highlighted that the NIH Grants Policy Statement, the Uniform Administrative Requirements For Awards, 45 C.F.R. § 74 *et seq.*, and the Federal Acquisition Regulations cost principles at 48 C.F.R. subpart 31.2 are terms and conditions of award.

34.     Among the terms and conditions of NIH grant awards established by these sources are (i) financial management system requirements; (ii) rules limiting the use of foreign goods and services; and (iii) cost principles defining the expenses that may be properly charged to the grants.

*Financial Management System Requirements*

35.     Prior to award, grantees must have in place an adequate financial management system.  Specifically, the small business's accounting system must include: "[r]ecords that identify adequately the source and application of funds for HHS-sponsored activities;" "[e]ffective control over and accountability for all funds;" "[w]ritten procedures for determining the reasonableness, allocability and allowability of costs in accordance with . . . the terms and conditions of the award;" and "[a]ccounting records . . . that are supported by source documentation."  45 C.F.R. § 74.21; *see generally* NIH Grants Policy Statement 8.3.

36.     These requirements are intended to ensure that the grantee's expenditures of grant funds are consistent with the approved project and in compliance with the terms and conditions of the grant.

37.     Section 8.3.1 of the NIH Grants Policy Statement emphasizes the importance of these financial management requirements:  "The standards and

requirements for a financial management system are essential to the grant relationship.  NIH cannot support the research unless it has assurance that its funds will be used appropriately, adequate documentation of transactions will be maintained, and assets will be safeguarded."

38.     Section 8.3.1 of the NIH Grants Policy Statement further states that a small business's "failure to establish adequate control systems constitutes a material violation of the terms of the award."

39.     Because the financial management systems are so essential to the grant relationship, NIH requires certain grant applicants to provide additional information by submitting a financial questionnaire as part of the overall grant application and evaluation process.  NIH uses this additional information to evaluate the applicants' systems and make appropriate funding decisions.  As part of the financial questionnaire, the small business is asked to affirm that its accounting system includes a project cost ledger that records expenditures by required budget cost categories and that accounting entries are supported by appropriate documentation.

40.     The small business is also required to affirm the existence of adequate financial management systems in the Small Business Verification Statement, a required component of the grant application.  By signing that Statement, the small business affirms its understanding that "drawing NIH award funds from the HHS Payment Management System serves as certification that the [grantee] has in place written policies and procedures for financial and business management systems that comply with 45 C.F.R. 74 [the Uniform Administrative Requirements For Awards] and the NIH Grants Policy Statement and will follow those policies and procedures."

*Foreign Goods And Services*

41.     The research and development work of an SBIR grantee must be performed in its entirety in the United States.  SBIR grantees are required to use American workers and American-made goods.  For this reason, the NIH Grants Policy Statement and the Notices of Award purposefully warn grantees against expending grant funds on products, services, and work that would inure primarily to the benefit of foreign nationals or foreign businesses.  *See, e.g.*, NIH Grants Policy Statement 18.5.2.

42.     In those rare instances when it may be necessary to purchase foreign materials or use foreign workers, the grantee must thoroughly justify the request and obtain approval from NIH for incurring or charging such costs.[3]  If approved, this waiver from NIH is expressly stated in the Notice of Award. Without a waiver, grantees must budget for and use non-SBIR funds for work outside of the United States.

43.     These requirements are consistent with the legislative intent underlying the SBIR program, which includes increasing the competitive advantage of American small businesses and building a strong national economy.  *See* Small Business Research & Development Enhancement Act of 1992, Pub. L. No. 102-564, § 306, 106 Stat. 4249 (entity receiving SBIR funding "should . . . purchase only American-made equipment and products, to the extent possible in keeping with the overall purposes of that program").

---

[3] For example, when a material or the study design is not available in the United States, NIH may allow a small portion of the work to be performed by a foreign organization.

*Cost Principles*

44.     Grantees are subject to a series of cost principles requiring that any expenses paid from federal grants be reasonable, directly benefit the work done under the grant, and follow the terms and conditions of the Notice of Award.  A cost that meets all of these requirements is "allowable" and can be properly charged to a federal grant.  *See* 48 C.F.R. §§ 31.201-2 to 31.201-4.

45.     Conversely, a cost that does not meet these requirements is "unallowable."  *See* 48 C.F.R. § 31.201-2.  Costs that are unallowable are required to be clearly identified and cannot be included in any billing, claim, or grant application.  48 C.F.R. § 31.201-6.  In other words, unallowable costs must not be paid with federal grant money.  If an unallowable cost is paid with federal grant funds, the grantee must refund the money to the grant's issuing agency.  NIH can recover unallowable costs charged to a grant.  45 C.F.R. § 74.73.

46.     The cost principles governing for-profit grantees, such as SBIR grantees, are detailed in the Federal Acquisition Regulations, 48 C.F.R. subpart 31.2.  These regulations identify specific cost categories that are unallowable. The following are relevant here:

47.     The costs of trade shows and conferences aimed at promoting the sale of products or services are not allowable costs.  *See* 48 C.F.R. § 31.205-1(f).

48.     Marketing activities aimed at promoting the sale of products or services are not allowable costs.  *See id*.

49.     Travel costs must directly benefit the purposes of the grant, *see* 48 C.F.R. § 31.201-4, and must comply with the Federal Travel Regulation.  48 C.F.R. § 31.205-46.

50.     Costs resulting from unallowable costs are not allowable.  48 C.F.R. § 31.201-6.

**(iii)    SBIR Grants Awarded To Telehealth**

51.     NIH awarded to Telehealth the following SBIR grants:

| Grant No. | Grant Name | Amount Paid |
|---|---|---|
| HL110438 | A Novel Home-Based Approach To Sleep Apnea | $199,965 |
| NR012629 | Beyond Pillboxes: Medminding For Universal Drug Delivery | $199,973 |

These grants will be referred to collectively as the "SBIR Grants," and are more fully described as follows:

52.     **HL110438 ("Sleep Apnea Grant")**:  This SBIR grant was awarded by the National Heart, Lung, and Blood Institute, a component of NIH.   Its purpose was to develop a home-based system for detecting and monitoring sleep apnea episodes.

        a.     Telehealth submitted to NIH its grant application for the Sleep Apnea Grant on December 6, 2010.   Hahn is listed as the Principal Investigator, and he signed the grant application as AOR.  (Ex. 1: Sleep Apnea Grant Application.)   By doing so, he certified on behalf of Telehealth that all statements in the grant application were true, and that Telehealth had the required financial management systems in place.

        b.     In its grant application, Telehealth affirmed that "all research and development on the project [would] be performed in its entirety in the United States."  (*Id.* at 41.)  It stated its only international collaborator would

13

be "a Canadian consultant [who] will be paid for work done in the US." (*Id.* at 5, Question 6.)

        c.      Telehealth submitted to NIH in connection with the Sleep Apnea Grant a Small Business Verification Statement dated April 24, 2011. (Verification attached hereto as Exhibit 2.)   Hahn signed the Verification.   By doing so, he verified that "[t]he research space occupied by [Telehealth] is available to and under the control of [Telehealth] for the conduct of its portion of the proposed project." (*Id.* at Question 3.)   Hahn also verified that "[a]ll research on the . . . grant will be performed *in its entirety* in the United States, unless otherwise approved by the Grants Management Officer prior to issuance of an award." (*Id.* at Question 4 (emphasis in original).)   Hahn further verified Telehealth's understanding that "drawing NIH award funds from the HHS Payment Management System serves as a certification" that Telehealth has the required financial management systems in place, and will comply with 45 C.F.R. § 74 and the NIH Grants Policy Statement. (*Id.* at Question 7.)

        d.      Telehealth submitted to NIH in connection with the Sleep Apnea Grant a financial questionnaire. (Sleep Apnea Financial Questionnaire attached hereto as Exhibit 3.)   Therein, Telehealth affirmed that it maintained a project ledger recording expenditures by required cost categories and maintained supporting documentation for accounting entries.   It specified that "[i]nvoices, receipts, [purchase orders], and all other documentation is processed monthly to support statements from financial institutions." (*Id.*)

        e.      Telehealth submitted to NIH Federal Financial Reports on April 16, 2012, July 31, 2012, and April 10, 2013 reporting expenditures under the Sleep Apnea Grant. (*See* Financial Reports, attached collectively hereto as Exhibit

4, at 1-4, 6-7.)  Brue signed the Reports.  By doing so, she certified on behalf of Telehealth that the statements in the Reports were true and accurate, and that the expenditures reported were made for the purpose and in compliance with the conditions of the Sleep Apnea Grant.

       f.      Through the Sleep Apnea Grant, the United States paid Telehealth $199,965, which Telehealth drew down in multiple installments from the HHS Payment Management System.  (*See* Payment Management System Transaction Report, attached hereto as Exhibit 5.)  Each time Telehealth drew down grant funds, it re-certified that Telehealth possessed adequate financial management systems.

53.    **NR012629 ("Pillbox Grant")**:  This SBIR grant was awarded by the National Institute of Nursing Research, a component of NIH.  Its purpose was to develop a pillbox accommodating multiple forms of medication and capable of reminding users to take their medications.

       a.      Telehealth submitted to NIH its revised grant application for the Pillbox Grant on March 31, 2011.  Hahn is listed as the Principal Investigator, and he signed the grant application as AOR.  (Pillbox Grant Application attached hereto as Exhibit 6.)  By doing so, he certified on behalf of Telehealth that all statements in the grant application were true, and that Telehealth had the required financial management systems in place.

       b.      In its grant application, Telehealth affirmed that "all research and development on the project [would] be performed in its entirety in the United States."  (*Id.* at 40, Question 4.)  It further indicated that the project would not involve partnerships with international collaborators.  (*Id.* at 5, Question 6.)

c.      Telehealth submitted to NIH in connection with the Pillbox Grant a financial questionnaire.  (Pillbox Financial Questionnaire attached hereto as Exhibit 7.)  Therein, Telehealth affirmed that it maintained a project ledger recording expenditures by required cost categories and maintained supporting documentation for accounting entries.  It specified that "[i]nvoices, receipts, [purchase orders], and all other documentation is processed monthly to support statements from financial institutions."  (*Id.*)

d.      Telehealth submitted to NIH Federal Financial Reports on April 16, 2012, July 31, 2012, and March 20, 2013 reporting expenditures under the Pillbox Grant.  (*See* Ex. 4: Federal Financial Reports at 1-5.)  Brue signed the Reports.  By doing so, she certified on behalf of Telehealth that the statements in the Reports were true and accurate, and that the expenditures reported were made for the purpose and in compliance with the conditions of the Pillbox Grant.

e.      Through the Pillbox Grant, the United States paid Telehealth $199,973, which Telehealth drew down in multiple installments from the HHS Payment Management System.  (*See* Ex. 5: Transaction Report.)  Each time Telehealth drew down grant funds, it re-certified that Telehealth possessed adequate financial management systems.

**(iv)   Defendants' False Certifications Of Financial Management Systems**

54.      Despite certifications and repeated re-certifications that it had the required financial management systems in place, Telehealth lacked an adequate system for managing and accounting for the federal grant funds.

55.      During the relevant period, Telehealth did not maintain contemporaneous accounting records of grant-related income and expenditures.

For example, Telehealth did not maintain contemporaneous or accurate grant cost ledgers by the required cost categories.  Further, it did not maintain complete supporting documentation for the accounting entries, such as invoices, receipts, and purchase orders.  According to Brue, "accounting . . . was chaotic." (Brue Sentencing Transcript (March 30, 2016) attached hereto as Exhibit 8 at 16.)

56.     Telehealth did not segregate grant funds from other business funds or from Brue and Hahn's personal funds.  As Brue described, federal and private funds were "intermingled" and "pooled into one common bank account."  (*Id.* at 16.)  Hahn, Brue, Telehealth, and affiliated businesses routinely transferred funds – including grant funds – among themselves.  Brue and Hahn's affiliated businesses paid each other's expenses.  (*See*, *e.g.*, *id.* ("When [Brue] paid [the companies'] bills, [she] paid no attention to whose money was going toward what item.").)

57.     In addition to this commingling of cash, Brue and Hahn used personal credit cards for grant-related and personal expenses, but grant funds were used to pay the credit card balance.

58.     Over the relevant period, Telehealth used at least 13 different bookkeepers.  Some of these bookkeepers had little to no formal training or experience in bookkeeping or accounting.  Most of these bookkeepers had little to no knowledge of, or training on, the rules and regulations governing federal grant funds.

59.     All grant accounting was done at Brue's direction and with Hahn's knowledge.  Brue instructed the bookkeepers on how to categorize expenses in Telehealth's ledger system, including on the charging of expenses to federal

grants.   Brue did not discuss NIH grant accounting requirements with the bookkeepers.

60.   Although Brue directed Telehealth's bookkeepers, she made repeated statements about being "misfitted" and "not wired" for grant accounting work.   She admitted that she "stayed way too oblivious to details" when it came to "the accounting office [she] was charged with managing" and claims she "panicked when [she] had to do bureaucratic tasks, file reports, and fill out forms" related to the grants.   (*Id.* at 15-16.)

61.   Similarly, Hahn conceded that he did not understand the grant administration rules or try to educate himself on those requirements.   (Hahn Sentencing Transcript (June 13, 2016) attached hereto as Exhibit 9 at 26.)

62.   Telehealth's bookkeepers recognized that the company's financial management systems were inadequate.   For example, a former bookkeeper stated that, in or around 2013, Telehealth's accounting ledgers had not been updated in two or three years, despite the company's receipt of nearly $400,000 in SBIR grant funding during the same period.

63.   In or around 2013, Telehealth hired bookkeepers with some training in accounting and with knowledge of grant regulations to prepare for an NIH audit.   These experienced bookkeepers emphasized (i) the importance of recording expenses contemporaneously and maintaining source documents; (ii) that grant funds must be segregated from other funds and accounted for separately; (iii) that separate credit cards should be used for business and personal transactions; and (iv) that personal and business funds should not be commingled.   But Brue and Hahn did not make these improvements to the company's financial management systems.

64.     In summary, Telehealth lacked the financial management systems the grant rules require.

65.     Defendants certified in the Sleep Apnea Grant and Pillbox Grant applications that Telehealth had the required financial management systems. Defendants affirmed in the financial questionnaires that Telehealth maintained project ledgers and supporting source documentation, as required.   Telehealth re-certified that it had these financial management systems each time it drew down grant funds from the HHS Payment Management System.   These certifications were all false, and known to be false by Defendants at the times made.   These false certifications were made by Defendants for the purpose of obtaining federal grant funds from NIH.

66.     NIH relied on these certifications in awarding and paying grant funds to Telehealth.   The grants would not have been awarded, and grant funds would not have been paid, had NIH known that Telehealth lacked adequate financial management systems.

### (v)     False Statements In SBIR Grant Applications

67.     In addition to these false certifications regarding financial management systems, Telehealth made numerous false statements to NIH in its Sleep Apnea Grant and Pillbox Grant applications, including false statements regarding its facilities and its personnel.  For example:

68.     In its applications for the Pillbox Grant and the Sleep Apnea Grant, Telehealth makes repeated references to the "Company's Field Research Office" at 140 High Street, Springfield, Massachusetts, and states that Brue maintains an office there.  In the Sleep Apnea Grant application, Telehealth claims that this address is "housed within Baystate Medical Center;" in the Pillbox Grant

19

application, it claims that this address is "adjacent to the Baystate Medical Center." Baystate Medical Center has affiliations with Tufts University and the University of Massachusetts. In both applications, Telehealth repeatedly emphasizes the importance of this location and its resources to the projects' research.

69. But, Telehealth never had an office at 140 High Street in Springfield, or within Baystate Medical Center; nor did Brue. In fact, Telehealth and Brue had no official affiliation with Baystate Medical Center. By falsely listing this address, and suggesting an association with the Medical Center, Telehealth added credibility to its grant applications.

70. Listing this address also renders Telehealth's Small Business Verification Statement false. This address was not "available to [or] under the control of" Telehealth, as affirmatively verified.

71. In its applications for the Pillbox Grant and the Sleep Apnea Grant, Telehealth states that its "lead programmer," Bud Panjwani, will perform the software programming tasks. The applications claim that Mr. Panjwani has "worked closely" with Telehealth's contracted engineers "continuously since joining the team in 2007." These grant applications list Mr. Panjwani's annual salary as $76,200. They also include a personal statement written in the first person purportedly by Mr. Panjwani.

72. The Sleep Apnea Grant and Pillbox Grant applications were submitted in 2010 and 2011, respectively, but Mr. Panjwani's employment with Brue, Hahn, and their affiliated companies ended in 2008. Further, during his employment, Mr. Panjwani's annual salary was approximately $30,000, not

20

$76,200.  Mr. Panjwani was not aware that his name was included on these grant applications, and he did not prepare the personal statements.

73.     In its applications for the Pillbox Grant and the Sleep Apnea Grant, Telehealth highlights the experience of a consultant, Jane Garb.  The Sleep Apnea Grant application describes Ms. Garb's "extensive experience with the team of investigators" including her provision of "analysis on many prior projects," which "has served this team well for several years."  The Pillbox Grant application states that Ms. Garb "worked with this team creating this exceptional adherence aid," and has "developed a good understanding of their products' capabilities . . . in real-time and real-word settings."

74.     But, Ms. Garb did not, in fact, work on any projects with Telehealth or with Hahn; she only assisted with the preparation of grant applications.

75.     Telehealth submitted as part of its Sleep Apnea Grant application a letter of support from Dr. Garry Welch.  This letter is written in the first person and is signed.

76.     Dr. Welch did not write this letter, and did not authorize anyone to prepare or send it on his behalf.  The signature is not Dr. Welch's, and he did not authorize anyone to sign it on his behalf.

77.     Defendants certified in the grant applications that all "statements herein are true . . . and accurate."  These certifications were knowingly false because Defendants knew that the grant applications contained false statements, including those identified herein.

78.     NIH relied on Defendants' statements regarding Telehealth's facilities, personnel, and salaries in awarding the grants to Telehealth.  NIH

21

would not have awarded the grants to Telehealth had it known Defendants made false statements in the grant applications.

**(vi)** **Telehealth's Mischarging Of Unallowable Costs To SBIR Grants**

79.     Defendants obtained the SBIR Grants through fraud by virtue of the false certifications and false statements included in the grant applications. After receiving these Grants, Defendants continued to defraud NIH by knowingly charging unallowable costs to the SBIR Grants, including those described below.   Defendants spent grant funds on unallowable costs while repeatedly certifying in the Federal Financial Reports that all expenditures were made for the purposes and in compliance with the conditions of the SBIR Grants.

80.     Defendants knowingly spent grant funds on the following unallowable costs:

*Foreign Goods And Services*

81.     Telehealth used grant funds to purchase goods and services from foreign sources.

82.     For example, Telehealth's SBIR Grants ledger shows that Telehealth used grant funds to purchase the following from foreign sources:

| Date | Payee | Location | Description | Amount |
|------|-------|----------|-------------|--------|
| 9/7/11 12/15/11 | Beijing Choice Electronics | China | "pulse oximeters" | $350 $330 |
| 12/31/11 4/19/12 | VitalSignals Enterprises | Canada | Accounting services | $17,712 |
| 12/31/11 | VitalSignals Enterprises | Canada | Medminder software programming | $24,675 |
| 1/31/12 | VitalSignals Enterprises | Canada | Sleep Apnea software programming | $28,341 |
| 6/1/12 | VitalSignals Enterprises | Canada | "supplies for apnea" | $30,000 |
| 6/14/12 | VitalSignals Enterprises | Canada | "supplies for apnea" | $15,000 |
| 7/9/12 | VitalSignals Enterprises | Canada | "supplies for apnea" | $10,059 |

| Date | Payee | Location | Description | Amount |
|------|-------|----------|-------------|--------|
| 7/25/12 | Fountain Technology | China | "device development" | $15,745 |
| 9/18/12 | Enterprises, Inc. | | | $2,180 |
| 8/23/12 | Novotech Technologies | Canada | "prototypes" | $4,185 |
| 9/5/12 | Herysun Co. Ltd. | China | "power adapters" | $260 |

83.     Telehealth did not request or receive a waiver from NIH to use grant funds to purchase any of these goods or services from foreign sources.

84.     Telehealth's purchases of foreign goods and services were not in compliance with applicable rules and are not allowable costs.  *See* NIH Grants Policy Statement 18.5.2.1; NIH Grants Policy Statement 8.1.2.10.

85.     Further, Telehealth made these foreign purchases despite having stated in its SBIR Grant applications and in the Small Business Verification Statement that all research and development would be performed in its entirety in the United States.   It did not identify the businesses listed above as international collaborators in the Grant applications.

***Personal Expenses***

86.     Telehealth used federal grant funds to pay Brue and Hahn's personal expenses.

87.     For example, Telehealth's SBIR Grants ledger shows that grant money was used to pay for (i) "meals and entertainment," including restaurant charges and a trip to Keeneland racetrack ($3,478); (ii) Automobile Club membership fees ($147); (iii) Harry and David gift items ($554); (iv) storage fees ($2,700); and (v) costs associated with moving ($6,269).

88.     As another example, Telehealth's SBIR Grants ledger shows 22 payments totaling $4,203 to personal credit cards for interest.

89.     These personal expenses are  not allowable costs.  *See* 48 C.F.R. §§ 31.201-2 & 31.201-4.

### Marketing and Commercialization Expenses

90.     Telehealth used federal grant funds to pay for marketing and other activities aimed at the commercialization of the company's products.

91.     For example, Telehealth's SBIR Grants ledger shows (i) $3,000 paid to Integrated Marketing Werx for "Commercialization Consulting;" (ii) $11,884 paid to Asenz 360 for "website/graphics;" and (iii) $2,251 paid to Myopia Design, a graphic designer for websites and brochures, for "supplies," "other costs," and "service charges."

92.     These marketing and commercialization costs are not allowable costs.  48 C.F.R. § 31.205-1.

### Conferences And Trade Shows

93.     Telehealth spent federal grant funds on costs associated with participating in conferences and trade shows for the purpose of promoting the company's products.

94.     For example, Telehealth's SBIR Grants ledger shows $21,805 for (i) "Registration Fees," including to the American Telemedicine Association, American Geriatrics Society, and Health Information and Management Systems Society; (ii) "Conferences and Meetings – Other Travel Costs" for food and travel insurance; and (iii) "Conferences & Meetings – Supplies, Leads, Electricity," for trade show display equipment and trade show marketing services.

95.     Costs associated with conferences and trade shows to promote the sales of products are unallowable costs.  48 C.F.R. §§ 31.205-1 & 31.201-6.  Costs

resulting from these unallowable costs – like meals at the conferences – are not allowable.  48 C.F.R. § 31.201-6.

*Travel*

96.    Telehealth spent federal grant funds on travel and related costs.

97.    As examples, Telehealth's SBIR Grants ledger shows $3,124 spent on at least 12 different commercial flights for Hahn and Brue, and $986 spent on "in-flight purchases."

98.    These costs did not directly benefit the purposes of the SBIR Grants, and there is no indication that they complied with the Federal Travel Regulation.  Accordingly, these costs are not allowable.  *See* 48 C.F.R. §§ 31.201-4 & 31.205-46.

*False Claims In Connection With Unallowable Costs*

99.    Brue's certifications on behalf of Telehealth in the Federal Financial Reports that all expenditures of grant funds were made for the purposes and in compliance with the conditions of the grants were false because SBIR grant funds were spent on unallowable costs, including those detailed above.  Defendants knew or had reason to know that these certifications were false at the times made.  Brue and Hahn made, or caused to be made, these false certifications in order to secure grant payments from NIH and in furtherance of their scheme to defraud the United States.

100.    NIH would not have permitted the withdrawal of grant funds from the HHS Payment Management System had it known that these certifications were false.

101.    Brue pled guilty to making false or fraudulent claims to the United States in violation of 18 U.S.C. § 287 in connection with the Federal Financial

Reports dated July 31, 2012 and April 10, 2013. *See United States v. Vesta Brue*, E.D. Ky. No. 5:15-CR-110-DCR. (Plea Agreement and Judgment attached as Exhibit 10.) Brue admitted that those Federal Financial Reports constitute false claims because she knowingly and falsely certified compliance with grant conditions when, in fact, grant funds had been spent on unallowable costs.

102. Hahn pled guilty to conspiracy to defraud the United States with respect to such false claims in violation of 18 U.S.C. § 286. *United States v. Jerome Hahn*, E.D. Ky. No. 5:16-CR-15-DCR. (Plea Agreement and Judgment attached as Exhibit 11.) Hahn admitted that he and Brue made an agreement to defraud the United States by getting false claims paid. He further admitted that the July 31, 2012 and April 10, 2013 Federal Financial Reports constitute false claims because of the false certifications of compliance with grant conditions that were made therein on behalf of his company, Telehealth. Hahn admitted that he knew or had reason to know of the certifications' falsity at the times made. (*See id.*; *see also* Ex. 9: Hahn Sentencing Transcript at 26 ("I did know that our reports were not accurate . . . at the time these reports were made.").) As part of his plea agreement with the United States, Hahn agreed to restitution of $222,037 paid to NIH, the victim of his conspiracy to defraud the government, and the Court ordered such restitution as part of the criminal judgment entered against him. (*See* Ex. 11: Hahn Judgment.)

      **(vii)**   **Telehealth's False Statements In Grant Ledgers And Falsification Of Invoices**

103. In 2013, NIH audited Telehealth. At NIH's request, Defendants produced Telehealth's SBIR Grants ledger to account for its use of the federal

grant funds.  Defendants also produced to NIH invoices and receipts as support for the entries in Telehealth's SBIR Grants ledger.

104.     In the SBIR Grants ledger and supporting documentation produced to NIH, Telehealth made numerous false statements in an attempt to conceal that the grant funds had been misspent and needed to be repaid.  Hahn knew, or had reason to know, of these false statements.

### False Entries

105.     In its SBIR Grants ledger, Telehealth listed costs that were not actually incurred.

106.     As examples, Telehealth lists (i) a $200 payment made to Norman Dauber (Brue's brother) for "Apnea – Clinical Trial Costs;" (ii) $385 in payments to C. Graham, D. Paugh, B. Hagen, and P. Schelb for "Study Participants;" and (iii) a $1,100 payment made to USAA on June 7, 2012 for "Insurance Property." But, these expenses were not actually incurred by Telehealth.

107.     As another example, Telehealth lists in its SBIR Grants ledger a $17,712.16 payment to VitalSignals Enterprises ("VitalSignals") (a company owned by Hahn).  In support of this payment, Telehealth produced to NIH two invoices from VitalSignals, and a memorandum written by Brue explaining the services purchased.  But, Telehealth did not actually make this payment to VitalSignals.

### Mislabeling Of Costs

108.     In other instances, Telehealth mislabeled costs that it actually incurred in order to make them appear grant-related.

109.     For example, Telehealth lists in its SBIR Grants ledger five payments made to USAA totaling $10,785 as "Insurance – General Liability."  In

fact, these were payments on a personal credit card issued by United Services Automobile Association.

110.    As another example, Telehealth lists $1,755 in payments to "Designer Home Tending" for "San Antonio Office Rent."   In fact, Designer HomeTending is an entity that provides temporary occupant service for owners of vacant homes.

111.    As another example, Telehealth lists a $50 "misc." charge for "dues and subscriptions."  In fact, this was a personal credit card fee.

112.    As another example, Telehealth lists an $80.73 payment to "MTC Inc." for "prototype costs."   In fact, this was a payment to a restaurant group in San Antonio.

113.    As another example, Telehealth lists a $350.88 payment to "CIC On-Line" for "licenses and permits."   In fact, this was a payment for a Canadian visa.

### False Invoices

114.    Defendants provided false invoices to NIH auditors in order to make costs in Telehealth's SBIR Grants ledger appear grant-related.

115.    For example, to support a $10,059.20 payment Telehealth made to VitalSignals for "supplies for apnea," Defendants produced to NIH auditors an invoice dated July 9, 2012 and a memorandum written by Brue to explain the invoice.   These documents indicate that the payment was for Steve Glaeske's work developing apnea sensors for the Sleep Apnea grant project, and that Glaeske was paid for 130 hours of work at the rate of $43 per hour.  The invoice lists for VitalSignals an address in Texas.

116.    This invoice contains many false statements.   VitalSignals was located in Canada, not Texas.  The work for which VitalSignals was being paid

was actually performed by Microlynx Inc., a sub-contractor of VitalSignals, not by Glaeske.  Further, Microlynx Inc. performed work on the Pillbox Grant, not the Sleep Apnea Grant.  Finally, even if the work was performed by Glaeske, Glaeske earned $20 per hour, not $43 as stated on the invoice.

117.   In summary, Telehealth knowingly made false statements in its SBIR Grants ledger and in the invoices provided to NIH in order to conceal or avoid its obligation to return misspent grant money to NIH.  Hahn knew, or had reason to know, that these statements were false.

**B.  Defendants' Fraud In Connection With The Qualifying Therapeutic Discovery Project Grant**

### (i)    The Qualifying Therapeutic Discovery Project

118.   The United States awarded Defendants one of the federal grants at issue through the Qualifying Therapeutic Discovery Project program ("QTDP Program").

119.   The QTDP Program was created by Congress as part of the Patient Protection and Affordable Care Act of 2010.  *See* P.L. 111-148; HR 3590.AS Sect. 9023.   The U.S. Internal Revenue Service ("IRS") consulted with NIH in conducting this Program; NIH provided peer review of the grant applications.

120.   Through the QTDP Program, eligible small businesses could receive either a tax credit or, in certain circumstances, a grant for "qualifying therapeutic discovery projects," defined as those projects developing a product to treat or prevent disease or a technology to deliver or administer therapeutics. *See* 26 U.S.C. § 45D; *see also* IRS Notice 2010-45, at Sect. 8 (attached hereto as Exhibit 12.)

121.    As with SBIR grants, applicants for the QTDP Program grants were required to submit an application.  *See* Ex. 12:  IRS Notice 2010-45 at Sect. 6 & Sect. 8.02.  QTDP Program applications were submitted to the IRS on a standard form called IRS Form 8942 (the "QTDP Standard Application Form").  The IRS, with NIH, reviewed applications using a number of criteria, including whether the proposed project was likely to result in new therapies, reduce long-term health care costs, advance the goal of curing cancer, and create high-quality jobs in the United States.  *See id.* at Sect. 5.01; *see also* 26 U.S.C. § 45D(d)(3).  The agencies relied on the truth and accuracy of the information contained in the application in evaluating these criteria and making award decisions.

122.    The QTDP Standard Application Form called for certain information, including (i) a description of the qualifying therapeutic discovery project; (ii) the number of employees and contractors employed by the applicant whose work was directly billed to the project and the average salaries of the employees and contractors; (iii) whether, as of the application date, the project was active; and (iv) a description of the applicant's "qualified investment" for taxable years 2009 and 2010 and the amounts thereof.  *See* Ex. 12:  IRS Notice 2010-45, Appendix A.

123.    The amount of the grant award was based on the amount of the qualified investment listed in the application.  Specifically, the statute contemplates the QTDP Program grant equaling 50% of the qualified investment. *Id.* at Sect. 8.01; *see also* 26 U.S.C. § 48D(a).

124.    "Qualified investment" is defined as the aggregate amount of the costs paid or incurred in the taxable year for expenses necessary for and directly related to the conduct of the underlying qualifying therapeutic discovery project.

30

*See* Ex. 12: IRS Notice 2010-45 at Sect. 4.01(a); *see also* Instructions For Form 8942 (attached hereto as Exhibit 13).  Qualified investments may include expenses for wages, supplies, and contractor costs.  *See* Ex. 13: Instructions For Form 8942. Qualified investments do not include remuneration paid to the chief executive officer of the applicant, or facility maintenance expenses, such as rent and utility costs.  *See id.*

125.    An investment is a qualified investment only if it was made in the taxable year 2009 or 2010.  *See* Ex. 12:  IRS Notice 2010-45 at Sect. 4.01(6).  The QTDP Standard Application Form included sections for (i) qualified investment actually paid or incurred as of the date the application was filed; and for (ii) qualified investment projected to be paid or incurred between the date of the application and September 30, 2010.  *See* Ex. 13:  Instructions For Form 8942.

126.    All applications for QTDP Program grants were required to include the following declaration, signed by a person with authority to bind the applicant and with personal knowledge:  "Under penalties of perjury, I declare that I have examined this submission, including the accompanying documents, and, to the best of my knowledge and belief, all of the facts contained herein are true, correct, and complete."  *See* Ex. 12:  IRS Notice 2010-45, at Sect. 7.02(1) & (2); *see also id.* at Appendix A (this "Penalties of Perjury statement is effective for ALL information submitted as a complete application").

**(ii)    The Oncology Grant Awarded To Telehealth**

127.    Telehealth was awarded the following grant (the "Oncology Grant") through the QTDP Program:

| Grant No. | Grant Name | Amount Paid |
|---|---|---|
| IRS13307 | An Innovative Drug Delivery And Adherence System For Oncology Patients | $244,479.25 |

128.    The Oncology Grant funded development work Telehealth claimed to be doing in connection with an electronic pillbox for oncology patients that would remind, monitor, and communicate pill usage (the "Oncology Project").

129.    Telehealth submitted to the IRS the grant application for the Oncology Grant on July 22, 2010.  (*See* Oncology Grant Application, attached hereto as Exhibit 14.)

130.    In its application for the Oncology Grant, Telehealth stated that it had 11 employees at the time of the application, seven of whose work was directly billed to the Oncology Project.  (*Id.* at 1-2.) It further stated that the average salary of full-time employees was $81,400, and of part-time employees was $12,800.  (*Id.* at 2.)

131.    In its application for the Oncology Grant, Telehealth stated that it paid 14 contractors for work on the Oncology Project.  It further stated that the average monthly hours for those contractors was 22, and their average monthly compensation was $1,791.  (*Id.*)

132.    In its application for the Oncology Grant, Telehealth made the following statements regarding its Qualified Investment:

| Qualified Investment | Tax Year 2009 | Tax Year 2010 |
|---|---|---|
| Qualified investment derived from employee wages. | $146,006 | $295,400 |
| Qualified investment derived from supplies and lab costs. | $95,604 | $50,300 |
| Qualified investment derived from third-party contractors. | $120,300 | $300,860 |

| | | |
|---|---|---|
| Qualified investment derived from other costs. | $5,605 | $6290 |
| **TOTAL** | **$367,515** | **$652, 850** |

133.    Hahn signed the grant application for the Oncology Grant.  By doing so, he declared, under penalty of perjury, that all statements in the grant application were true, correct, and complete.  (*Id.*)

134.    Relying on this certification and the statements Defendants made about the Oncology Project and its qualified investment, the IRS awarded Telehealth a QTDP Project grant in the amount of $244,342.

135.    Telehealth drew down the Oncology Grant funds from the HHS Payment Management System in four installments:  $43,500 on March 25, 2011; $56,500 on April 11, 2011; $100,500 on April 29, 2011; and $43,979.25 on May 17, 2011.  In total, the United States paid Telehealth $244,479.25 on the Oncology Grant.

### (iii)    Defendants' False Statements In The Oncology Grant Application

136.    Despite Hahn's certification that all statements in the Oncology Grant application were true, Telehealth's statements regarding its employees and qualified investment were false.

137.    Telehealth did not have eleven employees in 2010, never mind seven who worked on the Oncology Project.  It therefore did not make a qualified investment into those employees' salaries, as represented in the Oncology Grant application.

138.    According to a 2014 memorandum written on Hahn's behalf to the United States, Telehealth "could not afford employees" beginning in 2009, "and went from its peak of twelve employees to one – the IT guy who continued to

33

answer the phone and picked up the mail." (*See* Memorandum from Frost Brown Todd to United States dated January 24, 2014, attached hereto as Exhibit 15 at 4.) The memorandum further states Telehealth gave up its office around this time and operated from Brue and Hahn's home, before they became "essentially homeless" and started living "on the[ir] houseboat between December 2009 and the Fall of 2010." (*Id.* at 5.)

139.   During this same time period, Telehealth was "dormant" according to the memorandum, except for one sale to a Dutch distributor. (*Id.*) The memorandum makes no reference to an active Oncology Project, as represented in the Oncology Grant application.

140.   Further, Telehealth's payroll records show no payments to employees during the 2009 to 2010 time period.

141.   Despite repeated requests from the United States, Telehealth has produced no documents evidencing that it paid contractors or purchased supplies relating to the Oncology Project during the 2009 to 2010 time period.

142.   In summary, and on information and belief, Telehealth was not actively engaged in the Oncology Project at the time the Oncology Grant application was submitted, and did not make the qualified investment stated.

143.   Defendants knowingly made false statements in the Oncology Grant application in order to secure federal grant funding through the QTDP Program.

144.   Hahn's declaration that all statements in the Oncology Grant application were true, correct, and complete was knowingly false.

145.   The United States relied on Telehealth's statements regarding its personnel and qualified investment in awarding the Oncology Grant. The

government also relied on Hahn's declaration as to the veracity of those statements. It would not have awarded the Grant, or paid Telehealth the Grant funds, had it known that those statements and the declaration were false.

<u>C</u>OUNT <u>I</u>

**False Claims Act**
**31 U.S.C. § 3729(a)(1)(A), (B), & (G)**
**Against Both Defendants**

146.    The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

147.    This is an action for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), (B), and (G).

148.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment.

149.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to get a false or fraudulent claim paid by the United States.

150.    By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false statements to avoid or conceal obligations to pay the United States.

151.    The United States, unaware of the falsity of the records, statements, or claims made by Defendants, and in reliance on the accuracy thereof, awarded grants and paid claims that would not otherwise have been allowed.

152.    As a result, the United States suffered damages in an amount to be determined at trial.

<u>C</u>OUNT II

**Conspiracy To Violate The False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**
**Against Jerome Hahn**

153.    The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

154.    This is an action for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

155.    Hahn knowingly made an agreement with Brue to defraud the United States through the submission of false claims for payment.

156.    In furtherance of the conspiracy, and with Hahn's knowledge, Brue submitted false claims for payment to the United States on behalf of Telehealth, a company owned by Hahn.

157.    As a result, the United States suffered damages in an amount to be determined at trial.

<u>C</u>OUNT III

**Payment By Mistake**
**Against Both Defendants**

158.    The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

159.    This is an action for the recovery of monies paid by the United States to Telehealth as a result of mistaken understandings of fact.   Hahn received and retained the benefit of some of these monies.

160.    The United States paid Telehealth grant funds without knowledge of material facts and under the mistaken belief that Telehealth was entitled to

receive payment when it was not.  Hahn received and retained the benefit of some of these funds.

161.    Defendants are thus liable to account for and to pay such amounts, which are to be determined at trial, to the United States.

<u>COUNT IV</u>

**Unjust Enrichment
Against Both Defendants**

162.    The United States incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

163.    This is an action for the recovery of monies by which Defendants have been unjustly enriched.

164.    Defendants, directly or indirectly, received and retained the benefit of grant funds paid by the United States.

165.    Directly or indirectly, Defendants have been unjustly enriched with the federal grant funds, in an amount to be determined at trial, which they should not in equity and good conscious be permitted to retain.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, the United States of America, requests that judgment be entered in its favor and against Defendants, jointly and severally, as follows:

(a)    On Counts I and II under the False Claims Act, for the amount of the United States' damages, trebled as required by law and such civil penalties as are authorized by law, pursuant to 31 U.S.C. § 3729(a).

(b)     On Counts III and IV, for payment by mistake and unjust enrichment, for the amounts mistakenly paid to Defendants, or by which Defendants were unjustly enriched, plus interest, costs, and expenses.

(c)     With respect to each Count, interest, attorneys' fees, and costs as allowed by law, and all such further relief as may be just and proper.

<u>D</u>EMAND <u>F</u>OR <u>J</u>URY <u>T</u>RIAL

Pursuant to Federal Rule of Civil Procedure 38, the United States demands a trial by jury on all issues raised in its complaint.

Respectfully submitted,

**Kerry B. Harvey
United States Attorney**

By: s/ *Christine Corndorf*

Christine Corndorf
Carrie B. Pond
Assistant United States Attorneys
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507
859.233.2661
859.233.2533 (fax)
Christine.Corndorf@usdoj.gov
Carrie.Pond@usdoj.gov

Dated: July 26, 2016